482 S.E.2d 620

**Jeffrey L. MARLIN, Sr., et al., Plaintiffs Below, Appellants**

v.

**BILL RICH CONSTRUCTION, INC., et al., Defendants Below, Appellees.**

**No. 23121.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 11, 1996.

Decided Nov. 15, 1996.

Rehearing Denied Feb. 19, 1997.

James B. Stoneking and James G. Bordas, Jr., Bordas, Bordas & Jividen, Wheeling, for Appellant.

James D. Gray, Robert E. Gifford, Lori A. Dawkins, Steptoe & Johnson, Clarksburg, and Larry Blalock, Jackson & Kelly, New Martinsville, for Appellee, Wetzel County Board of Education.

W.E. Mohler, Charleston, for Appellees, Gandee & Partners.

John Gabhart, Thaxton & Johnstone, Charleston, for Appellees, Appalachian, Hart & Milam.

ALBRIGHT, Justice:

Appellants, workers who engaged in construction work at Hundred High School in Wetzel County, appeal[1] summary judgment entered in favor of appellee, the Wetzel County Board of Education, in a civil action brought by appellants and members of their households as a result of appellants being exposed to asbestos. The Circuit Court of Wetzel County, in granting appellee's motion for summary judgment with regard to the workers only, determined that appellants had suffered "injuries" compensable under workers' compensation. The trial court concluded that exposure to asbestos fibers resulting in a fear of contracting an asbestos-related disease, combined with physical manifestations of that fear, including loss of sleep, loss of appetite, anxiety, weight loss, etc., constituted such "injuries". Therefore, the trial court determined that appellants' claims were barred under W.Va.Code § 29–12A–5(a)(11) because of the Board's immunity, as a political subdivision, from claims "covered by any workers' compensation law". We find that the grant of summary judgment was erroneous and, therefore, reverse and remand for trial.

## FACTS

As part of the renovation phase of a project involving Hundred High School in Wet-

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

zel County, appellants, plaintiffs below, began work at the high school in May, 1988. Appellants who worked on the project, as opposed to the members of their households, were employees of subcontractors that were hired to perform the work. Prior to the beginning of this work, the Wetzel County Board of Education (Board) retained an asbestos consultant, in part to conduct a preconstruction survey of Hundred High School. Test results obtained by the consultant confirmed that asbestos was present. The consultant prepared a letter dated May 22, 1987, addressed to the Board, which stated, in part, that certain floor tiles contained asbestos. The letter stated that the floor tile did not pose a health hazard in its present condition, so long as it was not drilled, cut, or sanded.[2]

Appellants contend that they were never notified that asbestos was present at the site. Consequently, workmen drilled through the asbestos floor tiles to install pipe and conduit. The workmen also encountered asbestos that was not disclosed in the consultant's report. Appellants allege that they broke up asbestos heating pipes with sledgehammers and tore out overhead insulation materials, which created substantial amounts of airborne dust and debris.

According to appellants, Herb Stevey, a union steward, eventually questioned Jim Long, a "coordinator" for the Board's construction projects, about the existence of asbestos at the site. Appellants assert that Mr. Long insisted that the site was asbestos-free. Thereafter, Mr. Stevey and others requested that debris at the work area be tested for asbestos. Appellants assert that all such requests were refused. Eventually, one of the workers took samples of the debris, which were then sent to an independent laboratory. The results from the lab were received on July 6, 1988, and showed that there was asbestos in the debris. Thereafter, the workers walked off the job and notified federal authorities.

On July 7, 1988, Environmental Protection Agency (EPA) officials ordered construction work to cease. EPA tests confirmed the existence of asbestos where appellants had been working. According to appellants, John Heart, a representative of the asbestos consulting company, admitted to EPA officials that he had knowledge of asbestos in the heating pipes and that the failure to have the pipes abated was his oversight. The EPA ordered that the debris be properly disposed of as asbestos.

The workmen returned to the work area on July 11, 1988, after the asbestos consultant had advised that the site was asbestos free. However, the workmen observed that the site was not clean. EPA officials subsequently advised the asbestos consultant to properly perform the cleanup. The workmen ultimately returned to work on July 28, 1988.

A second exposure incident occurred in November, 1988, when Mr. Long directed workmen to remove asbestos floor tile that remained at the site and take it to a location at Mr. Long's residence. EPA officials were notified and discovered the illegal dumping of the asbestos.

On February 22, 1990, this suit was filed against the Board of Education, the general contractor, the architect, and the asbestos consultant on behalf of the workers who were exposed to asbestos and members of their households. Although none of the workers has been diagnosed with an asbestos-related disease, they allege that they were subjected to a high degree of risk of contracting such an illness and they now suffer from emotional distress, including fear of contracting an asbestos-related disease in the future. Moreover, appellants contend that they will incur future expenses related to medical tests to determine whether they have contracted an asbestos-related disease. The Board does not dispute the workers' claim that they were exposed to asbestos.

The Board, the architect, and the asbestos consultant each filed motions for summary judgment. By order entered April 20, 1995, the circuit court granted the Board's motion

---

**2.** The letter mentioned other asbestos findings, but appellants do not complain of exposure resulting from these sources.

as to appellants' claims and denied the motions of the architect and the asbestos consultant. On May 13, 1995, appellants filed a motion to reconsider or, alternatively, for amendment of the summary judgment to make it a final and appealable order. By order entered May 22, 1995, the court denied appellants' motion to reconsider and amended its grant of summary judgment to make it a final and appealable judgment regarding appellants' claims, leaving appellants' claims against the architect and consultant and the claims of members of appellants' households to be further litigated. Appellants now appeal the grant of that summary judgment.

## STANDARD FOR REVIEW

On appeal, "[a] circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Moreover, " '[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syl. pt. 2, *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821 (1995).

## IMMUNITY

As previously stated, the trial court granted the Board's motion for summary judgment based upon the Board's claim of immunity under W. Va.Code § 29–12A–5(a)(11), which provides that: "A political subdivision is immune from liability if a loss or claim results from: ... Any claim covered by any workers' compensation law or any employer's liability law...."[3]

3. Although appellants were not employees of the Board, this Court has determined that "W.Va. Code, 29–12A–5(a)(11), clearly contemplates immunity for political subdivisions from tort liability in actions involving claims covered by workers' compensation even though the plaintiff was not employed by the defendant political subdivision at the time of the injury." Syl. pt. 6, *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992). The plaintiffs in *O'Dell* were

Appellants assign error to the court's ruling that the fear of contracting a future disease, together with physical manifestations of that fear, is a compensable work-related injury. Appellants contend that the court ignored the distinction between an occupational disease and other injuries under West Virginia's workers' compensation law. W.Va.Code § 23–1–1, *et seq.* Moreover, appellants assert that because they have not yet manifested an asbestos-related disease that resulted from their exposure at Hundred High School, they do not suffer a compensable occupational disease under the workers' compensation statute because such a disease must be presently suffered under our decision in *Powell v. State Workmen's Compensation Commissioner*, 166 W.Va. 327, 273 S.E.2d 832 (1980).

Appellee Board argues in response that appellants are eligible to receive workers' compensation benefits because they suffer from a mental condition that resulted from the physical trauma and insult of breathing asbestos. Additionally, appellee asserts that because appellants' mental conditions have produced physical disorders such as loss of sleep, loss of appetite, weight loss, and headaches, their conditions are compensable under our workers' compensation law. Finally, appellee argues that appellants are covered even for a "so-called mental-mental" claim because their injuries occurred prior to the July, 1993 enactment of W.Va.Code § 23–4–1f, "the purpose" of which is "to clarify that so-called mental-mental claims are not compensable" under our workers' compensation law. Thus, the Board concludes, it is immune from the claims of appellants under W.Va.Code § 29A–12–5(a)(11), because workers' compensation benefits may be recovered for those claims.

three workers not employed by the political subdivisions sued, but injured in the course of their employment by other employers. All three plaintiffs had sustained physical injuries and had applied for and been awarded workers' compensation, establishing beyond question that the injuries were "covered" by workers' compensation. As we will discuss, the threshold issue in the case *sub judice* is whether the claims here are "covered" at all by workers' compensation.

## The Nature of the Issue Before Us

Since appellants in this action have not filed claims under our workers' compensation law, we are called upon here to determine what is, or may, be a compensable injury under that law without the benefit of prior factual and legal determinations by the Workers' Compensation Commissioner and the Workers' Compensation Appeal Board. Rather than determine the merits of a claim for benefits under that legislation, we, like the trial court, are dealing with an affirmative defense raised in a civil action by appellee Board to avoid liability. In that posture, the Board bears both the burden of going forward with the evidence and the burden of persuasion regarding the existence of a compensable injury. Our decision today is binding as the law of this case and is perhaps binding on the appellants here with respect to some issues that might arise in any future claims filed by appellants under our workers' compensation law.[4] However, since the Workers' Compensation Commissioner is not a party to the action, our decision today cannot be fairly seen as binding on the Commissioner or the Appeal Board on issues they have not heard or litigated, although it may be instructive.

## The Threshold Issue

As noted,[5] the threshold issue in this case is whether the claims raised by the appellants are "covered" by workers' compensation. It appears that our workers' compensation law compensates for an "injury" or "personal injury", as that term is defined by W.Va.Code § 23–4–1. An examination of the definitions set forth in that section reveals three general classifications, which may be summarized as follows: (1) accidental physical injuries (caused by a definite, isolated, fortuitous occurrence), (2) occupational diseases [6], and (3) occupational pneumoconiosis.[7] In due course, our inquiry in the case *sub judice* will address these three general classifications of "injuries" or "personal injuries". However, before proceeding to that analysis, we must address the question of whether the immunity provided a political subdivision by W.Va.Code § 29–12A–5(a)(11) for "[a]ny claim *covered* by any workers' compensation law" provides protection against *all* tort lia-

---

4. We mention, but do not decide, the collateral effects of our ruling on workers' compensation claims any appellants may later file.

5. *See* footnote 3.

6. The West Virginia Legislature first explicitly provided for compensation for disability or death resulting from an occupational disease when it defined and provided compensation for silicosis in the Workmen's Compensation amendments of 1935, by adding article six to the statute. 1935 *Acts of the Legislature, Regular Session,* c. 79. In 1945, the Legislature repealed article six and moved the provisions relating to silicosis to article four of the workmen's compensation statute. 1945 *Acts of the Legislature, Regular Session,* c. 131. In 1949, the Legislature added occupational disease to the definition of "injury" or "personal injury" found in W.Va.Code § 23–4–1. 1949 *Acts of the Legislature, Regular Session,* c. 136. Prior to the statutory recognition of occupational disease in 1949, the issue of whether occupational diseases were compensable was first discussed in *Davis v. State Compensation Commissioner,* 110 W.Va. 25, 156 S.E. 844 (1931). The *Davis* Court could not determine whether an occupational disease was compensable under the workmen's compensation statute, because that question was not properly before it. However, the Court discussed the issue and observed that the intent of the Legislature with regard to the compensability of occupational diseases was questionable. Therefore, the Court invited the Legislature to clarify its policy regarding occupational diseases. *Id.* However, the Court subsequently determined that "[d]isease contracted in the course of and resulting from employment is not compensable under the West Virginia Compensation Act, Code 1931, 23–4–1, unless directly attributable to a definite, isolated, fortuitous occurrence." Syl. pt. 3, *Jones v. Rinehart & Dennis Co., Inc.,* 113 W.Va. 414, 168 S.E. 482 (1933) (found that an employees death from silicosis, which resulted from the inhalation of silica dust over a period of time, was not compensable under the West Virginia Workmen's Compensation Act). *See also* syl. pt. 1, *Montgomery v. State Compensation Commissioner,* 116 W.Va. 44, 178 S.E. 425 (1935) (Definite, isolated, fortuitous occurrence may occur over a period of time. Held "[d]isability, due to shock, exposure, and exhaustion, directly attributable to claimant's having become lost in a coal mine for a period of seven days, is the result of a 'personal injury' within the meaning of the Compensation Act....").

7. *See* 1969 *Acts of the Legislature, Regular Session,* c. 152, which defined and provided compensation for occupational pneumoconioses (OP). That enactment also moved the definition of and provisions for compensation of silicosis to the occupational pneumoconiosis provisions of the law.

bility to workers injured in the course of their employment by third persons or whether "covered" has some more precise meaning.

Appellants urge us to be mindful of the general rule that governmental immunity statutes should be construed in a manner favoring liability rather than immunity and further urge that the claims they assert in this action are not compensable under our workers' compensation statute.

In *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992), we found that W.Va.Code § 29–12A–5(a)(11) was not ambiguous in providing immunity for political subdivisions where the claims raised involved workers who were not employees of the political subdivision, but were employed by third persons who provided workers' compensation. We held that:

> W.Va.Code, 29–12A–5(a)(11), clearly contemplates immunity for political subdivisions from tort liability in actions involving claims covered by workers' compensation even though the plaintiff was not employed by the defendant political subdivision at the time of the injury.

*Id.* at syl. pt. 6, 425 S.E.2d 551.

In reaching that conclusion in *O'Dell*, this Court noted that to limit the immunity provided by W.Va.Code § 29–12A–5(a)(11) only to claims made by the political subdivisions' own employees would make the statutory immunity provided wholly duplicative of the immunity provided the political subdivision by the Workers' Compensation Act itself. The immunity provided an employer, including political subdivisions, by workers' compensation is not limited to "any claim covered" by workers' compensation. That immunity provided to employers is against "damages at common law or by statute for the injury or death of any employee, however occurring...."[8] The Local Governmental Tort Reform Act was not needed merely to give immunity to the political subdivisions against claims made by its own workers.

The *O'Dell* Court further addressed the question of whether the immunity found in W.Va.Code § 29–12A–5(a)(11) excluded those "elements of damages, such as pain and suffering, total lost wages, and mental anguish, not compensated by such [workers' compensation] benefits." 188 W.Va. at 610, 425 S.E.2d at 565. The Court declined to interpret "the word 'claim' in such a limited fashion", noting that workers' compensation "encompasses a variety of statutory monetary benefits ... some of which are included in the normal tort claim." *Id.* (citations omitted). Thus, the Court concluded, W.Va.Code § 29–12A–5(a)(11) "provides immunity to a political subdivision for all damages arising from a tortious injury, not merely for those compensated by workers' compensation." *Id.* It has been suggested that the case *sub judice* is controlled by this conclusion. We do not agree.

The *O'Dell* Court's conclusion that the immunity under discussion extended to all damages for a claim covered by workers' compensation, whether recoverable in an ordinary civil action or as workers' compensation benefits, does not determine the threshold question of whether or not appellants' claims are "*covered*" by workers' compensation, and we decline to extend the thrust of *O'Dell* beyond its conclusion that a political subdivision is protected as to all elements of damage arising under a "covered" claim.

In *Randall v. Fairmont City Police Department*, 186 W.Va. 336, 412 S.E.2d 737 (1991), we recognized that the general rule of construction in governmental tort legislation cases favors liability, not immunity. "[U]nless the legislature has clearly provided for immunity under the circumstances, the general common-law goal of compensating injured parties for damages caused by negligent acts must prevail." *Id.* at 347, 412 S.E.2d at 748 (citations omitted).

In *Randall,* we applied that rule by first determining that the "immunity" provided by W.Va.Code § 29–12A–5(a)(5) stated the common-law rule that a cause of action is not recognized for the breach of a general duty owed the public as a whole. *Randall* then recognized an exception to that rule, not expressed in the statute being construed

---

**8.** *See* W.Va.Code § 23–2–6 and 6a; *cf.* W.Va. Code § 23–2–8.

there, allowing such an action if a "special relationship" existed between the political subdivision protected by the statute and a particular member of the public. We said, "Lacking a clear [statutory] expression to the contrary, that statute ... does not immunize a breach of a special duty to provide ... such protection to a particular individual." *Id.* Thus, *Randall* may be seen as determining that the "immunities" contained in W.Va. Code § 29–12A–5 are not necessarily absolute and may be subject to exceptions or limitations.

Our task is similar here. While we have previously concluded in *O'Dell* that it is clear that the Legislature intended to immunize against workers' claims for all damages arising under claims shown to be compensable by workers' compensation, we lack clear statutory expression with respect to what "claims covered" means in the context of appellants' assertion here that their fear of contracting an asbestos related disease is not a compensable claim under workers' compensation. We note that if appellants' assertion is correct—if their claims are cognizable at law, and if the damages they claim are not, as in *O'Dell,* merely damages for which workers' compensation provides an alternate form of recovery—they will have no remedy for their present claims of the fear of contracting the disease and have no claim under workers' compensation until and unless their respective conditions develop to the point where benefits would be provided. In other words, if no benefits of any sort would be provided to appellants under workers' compensation by reason of their conditions, we cannot conclude that the conditions are "covered."

■ Accordingly, in light of the rule favoring liability, not immunity, and lacking a clear statutory expression in the circumstances we are addressing, we conclude that if the claims asserted by appellants would result in no benefits under any workers' compensation law or any employer's liability law, that is to say, if there is no recovery of benefits under such laws in lieu of damages recoverable in a civil action, then, notwithstanding W.Va.Code § 29–12A–5(a)(11), such claims are not "covered" within the meaning of the immunity statute and may be asserted in the courts of this State against a political subdivision which is not their employer,[9] and such recovery had as may be proved under a recognized cause of action. We now proceed to determine whether the claims asserted are indeed "covered" under our workers' compensation statute.[10]

## Occupational Pneumoconiosis

We will first address coverage in light of the definition of "occupational pneumoconiosis", as set out in W.Va.Code § 23–4–1, and the requirements for successful prosecution of a compensation claim therefor under that section and W.Va.Code § 23–4–15b. Occupational pneumoconiosis was first recognized by the Legislature as a workers' compensation injury or personal injury when W.Va.Code § 23–4–1 was amended in 1969. Now, as then, the statute defines occupational pneumoconiosis and sets out specific requirements for occupational pneumoconiosis claims in a manner that distinguishes those claims from claims for more traditional workplace injuries. As applicable to the case at hand, W.Va Code § 23–4–1 (1989) defines occupational pneumoconiosis and sets forth the time requirements for a compensable occupational pneumoconiosis claim, as follows:

> Subject to the provisions and limitations elsewhere in this chapter ..., the commissioner shall disburse the workers' compensation fund to the employees ... which employees have received *personal injuries* in the course of and resulting from their covered employment....

---

9. Our holding here is not intended to imply that an action could be maintained against the political subdivision as an employer. Such political subdivision's immunity as an employer is controlled by W.Va.Code § 23–2–6, *et seq.,* as previously noted, while the rights of employees to benefits under Chapter 23 are particularly defined by W.Va.Code § 23–4–1 and related sections.

10. Our research has produced no case addressing the threshold issue of whether a claim was "covered" by workers' compensation for the purpose of determining governmental immunity. In all the cases we found, workers' compensation coverage had been conclusively established.

For the purposes of this chapter the terms *"injury"* and *"personal injury"* shall include occupational pneumoconiosis and any other occupational disease, as hereinafter defined, and the commissioner shall likewise disburse the workers' compensation fund to the employees of such employers in whose employment such employees have been exposed to the hazards of occupational pneumoconiosis or other occupational disease *and in this state have contracted occupational pneumoconiosis or other occupational disease,* or have suffered a perceptible aggravation of an existing pneumoconiosis or other occupational disease, ... according to the provisions hereinafter made: Provided, That *compensation shall not be payable for the disease of occupational pneumoconiosis, or death resulting therefrom, unless the employee has been exposed to the hazards of occupational pneumoconiosis in the state of West Virginia over a continuous period of not less than two years during the ten years immediately preceding the date of his last exposure to such hazards, or for any five of the fifteen years immediately preceding the date of such last exposure.* An application for benefits on account of occupational pneumoconiosis shall set forth the name of the employer or employers and the time worked for each, and the commissioner may allocate to and divide any charges resulting from such claim among the employers by whom the claimant was employed for as much as sixty days during the period of three years immediately preceding the date of last exposure to the hazards of occupational pneumoconiosis. The allocation shall be based upon the time and degree of exposure with each employer.

For the purposes of this chapter *disability or death resulting from occupational pneumoconiosis, as defined in the immediately succeeding sentence, shall be treated and compensated as an injury by accident.*

*Occupational pneumoconiosis is a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the em-* *ployment. The term "occupational pneumoconiosis" shall include, but shall not be limited to,* such diseases as silicosis, anthracosilicosis, coal worker's pneumoconiosis, commonly known as black lung or miner's asthma, silico-tuberculosis (silicosis accompanied by active tuberculosis of the lungs), coal worker's pneumoconiosis accompanied by active tuberculosis of the lungs, *asbestosis,* siderosis, anthrax *and any and all other dust diseases of the lungs and conditions and diseases caused by occupational pneumoconiosis* which are not specifically designated herein meeting the definition of occupational pneumoconiosis set forth in the immediately preceding sentence. (Emphasis added.)

 This Court has consistently held that " '[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation.' Syl.Pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968)." Syl. pt. 1, *Powers v. Union Drilling, Inc.,* 194 W.Va. 782, 461 S.E.2d 844 (1995). This statute defines occupational pneumoconiosis as "a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment." It specifically enumerates certain diseases, including asbestosis, as occupational pneumoconiosis and further defines the disease as including also "any and all other dust diseases of the lungs and conditions and diseases caused by occupational pneumoconiosis...." We believe that W.Va.Code § 23–4–1 clearly requires that one who claims workers' compensation benefits for occupational pneumoconiosis must show: (1) the present existence of the disease or an aggravation of the disease which has been previously contracted and (2) exposure to the risk of occupational pneumoconiosis for a substantial period of time, including at least the specified minimum period of exposure while at work in West Virginia. We conclude that, under the definition and requirements for occupational pneumoconiosis claims set forth in W.Va.Code § 23–4–1, it is not sufficient to prove only the *fear* of eventually contracting

occupational pneumoconiosis or to show some exposure to the risk of contracting the disease for a period of time less than those periods set out in the statute.[11]

■ Appellants in the present case assert that their injuries resulted from the inhalation of asbestos fibers, causing them to *fear* that, in due time, they will contract a disease of the nature enumerated or generally defined by W.Va.Code § 23–4–1 as occupational pneumoconiosis. We cannot conclude, on the record before us, that appellants have, *in fact and presently,* contracted occupational pneumoconiosis by reason of the inhalation of minute particles of dust over a period of time or that they have suffered a perceptible aggravation of previously existing occupational pneumoconiosis. Accordingly, it cannot be said that, as a matter of law, appellants may successfully maintain a workers' compensation claim for "injury" by reason of occupational pneumoconiosis.

### Other Occupational Diseases

We note that W.Va.Code § 23–4–1 also provides that occupational diseases other than occupational pneumoconiosis are to be compensated under the Workers' Compensation Act as an "injury" or "personal injury". Again, the statute requires that any such disease be "*incurred* in the course of and resulting from employment." (Emphasis added.) This Court has determined that "W.Va.Code § 23–4–1, provides coverage for each new occupational disease as medical science verifies it and establishes it as such, without the need for special legislative recognition by addition to the scheduled diseases." Syl. pt. 2, in part, *Powell v. State Workmen's Compensation Commissioner,* 166 W.Va. 327, 273 S.E.2d 832 (1980).[12]

■ "Unlike traumatic injuries, the causal connection for occupational diseases must be established by showing exposure at the workplace sufficient to cause the disease and that the disease actually resulted in the particular case." *Id.* at 336, 273 S.E.2d at 837 (1980). Moreover, W.Va.Code § 23–4–1 states six criteria to be used in evaluating the causal connection between the employment and the occupational disease.[13]

---

11. We are aware that this Court, in *Powell v. State Workmen's Compensation Commissioner,* 166 W.Va. 327, 273 S.E.2d 832 (1980), appeared to find that lung cancer was a compensable "occupational disease" based upon the testimony of a physician regarding studies that showed a causal connection between lung cancer and asbestos exposure. However, this Court subsequently held that "[o]ur decision in *Powell* ... did not change the statutory definition of occupational pneumoconiosis and did not affect the processing system for an occupational pneumoconiosis claim." Syl. pt. 3, *Newman v. Richardson,* 186 W.Va. 66, 410 S.E.2d 705 (1991). The *Newman* Court granted a writ of mandamus to compel the Workers' Compensation Commissioner to refer certain dependents' claims to the Occupational Pneumoconiosis Board for review. The Commissioner had determined, based upon an erroneous interpretation of this Court's holding in *Powell,* that claims involving mesothelioma and other cancers arising from occupational exposure to asbestos were to be treated as an occupational disease and not as occupational pneumoconiosis. The Court explained that:

> *Powell* simply held that the exposure of Mr. Powell to asbestos resulted in an occupational disease, namely lung cancer. In *Powell,* the claim was processed as an occupational pneumoconiosis claim. After the Commissioner held that Mr. Powell's exposure met the requirements of the Act, the claim was referred to the Occupational Pneumoconiosis Board.

The Board determined 'that the employee's death was not due to occupational pneumoconiosis and that occupational pneumoconiosis was not a contributing factor in his death.' Based on the Board's findings, the Commissioner and the Appeal Board rejected Mrs. Powell's claim.

> In *Powell,* we then held that the Appeal Board was wrong in failing to recognize the clear "causal connection between exposure and the disease...." ... Our decision that the decedent's widow in *Powell* made a prima facie case showing that Mr. Powell's death was due to (or was contributed to) by an occupational disease did not change the statutory definition of occupational pneumoconiosis and did not affect the processing system for occupational pneumoconiosis claims.

*Newman* at 70, 410 S.E.2d at 709 (citations omitted).

12. By discussing "other occupational diseases" here, we do not alter our holding in syllabus point 3 of *Newman v. Richardson,* discussed in footnote 11 of this opinion. We address the question of "other occupational diseases" here because it is not clear beyond doubt what occupational diseases other than occupational pneumoconiosis appellee Board may undertake to prove in pressing its immunity defense.

13. The six criteria read as follows:

> Except in the case of occupational pneumoconiosis, a disease shall be deemed to have been

"[The] six criteria [in W.Va.Code § 23–4–1] make it clear that the occupational disease need not have been foreseen or expected before its contraction. It thus follows that if the claimant can establish the statutory criteria defining an occupational disease, the claim is to be held compensable." *Powell*, 166 W.Va. at 334, 273 S.E.2d at 836 (1980). Furthermore, "[i]f studies and research clearly link a disease to a particular hazard of a workplace, a prima facie case of causation arises upon a showing that the claimant was exposed to the hazard *and is suffering* from the disease to which it is connected." *Id.* at 336, 273 S.E.2d at 837 (emphasis added).

It is clear that in order to sustain a claim under workers' compensation for an occupational disease other than occupational pneumoconiosis, the claimant must *in fact and presently* suffer from the disease, just as in the case of occupational pneumoconiosis. In *Hobday v. Compensation Commissioner*, 126 W.Va. 99, 27 S.E.2d 608 (1943), this Court considered the compensability of an employee's death from tuberculosis. The issue was whether such employee's death had been caused by silicosis. At the time, W.Va.Code § 23–4–1 did not include its present definition of occupational pneumoconiosis, including silicosis. This Court was interpreting an older definition of silicosis as a compensable condition. After discussing the decedent's substantial amount of exposure to silicon dioxide dust, the Court commented: "It is not the mere exposure to silicon dioxide dust, however harmful, that justifies compensation. The exposure must produce silicosis, which, in turn, must produce the death." *Id.* at 107–08, 27 S.E.2d at 612. More recently, in *Ball v. Joy Mfg. Co.*, 755

F.Supp. 1344 (S.D.W.Va.1990), *aff'd*, 958 F.2d 36 (4th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 876, 116 L.Ed.2d 780 (1992), the United States District Court for the Southern District of West Virginia reviewed the West Virginia Workers' Compensation Act and relevant case law with respect to the alleged exposure of the plaintiffs to the possibility of contracting disease by reason of exposure to chemicals. The court concluded that "while showing an occupational exposure to a hazard of the workplace is a necessary condition to proving an 'injury' compensable under the Workers' Compensation Statute, it is not a sufficient condition alone—rather an employee must establish through medical evidence that such exposure is causally linked to a disease he/she presently suffers. In other words, medical evidence that such exposure can cause a particular disease is not sufficient to establish a compensable 'injury' under the Statute without the existence of the disease itself." *Id.* at 1356. Once again, we note that appellants' claim in the present case is that, because of the alleged inhalation of minute particles of dust over some period of time, appellants *fear* that they will eventually contract a disease. In keeping with the cases cited, we cannot conclude that, as a matter of law, appellants may successfully maintain a workers' compensation claim for "injury" by reason of the *fear* of contracting an occupational disease, as contrasted with having actually contracted the disease.

### Is the alleged "insult" to the lungs of appellants an injury?

Appellee Board relies heavily on evidence acquired in pre-trial proceedings below tending to show that the mere inhalation of asbestos fibers inescapably results in an "in-

incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances (1) that there is a direct causal connection between the conditions under which work is performed and the occupational disease, (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment, (3) that it can be fairly traced to the employment as the proximate cause, (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment, (5) that it

is incidental to the character of the business and not independent of the relation of employer and employee, and (6) that it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

... An employee shall be deemed to have contracted an occupational disease within the meaning of this paragraph if the disease or condition has developed to such an extent that it can be diagnosed as an occupational disease. W.Va.Code § 23–4–1 (1994).

sult" to lung tissue, arguing that such an "insult" constitutes an injury within the traditional concepts of workplace injuries, that is, a trauma or other physical harm to the body of the workers. The thrust of the argument is that since such a physical "injury" has occurred, the resulting complaints of appellants regarding loss of sleep and other conditions resulting from the fear of contracting occupational pneumoconiosis or other occupational disease constitutes a compensable "injury" under workers' compensation. We do not agree.

While W.Va.Code § 23–4–1 does not specifically define the term "injury" as contemplated by the statute, this Court, considering the traditional definition of "injury", has previously held that "West Virginia is a jurisdiction which requires proof of injury by accident. *Martin v. State Compensation Commissioner*, 107 W.Va. 583, 149 S.E. 824 (1929)." *Jordan v. State Workmen's Compensation Commissioner*, 156 W.Va. 159, 163, 191 S.E.2d 497, 500 (1972). *See also Barnett v. State Workmen's Compensation Commissioner*, 153 W.Va. 796, 172 S.E.2d 698 (1970); 21 M.J., Workers' Compensation, § 30 (1987). The classic definition of "injury" other than occupational pneumoconiosis or occupational disease has been as follows: "A compensable accident, according to the interpretations of past cases, is an injury incurred by an employee 'attributable to a definite, isolated, fortuitous occurrence.' [Syl. pt. 1], *Adams v. G.C. Murphy Company, a Corporation*, 115 W.Va. 122, 174 S.E. 794 (1934); *Jones v. Rinehart & Dennis Co., Inc.*, 113 W.Va. 414, 423, 168 S.E. 482 (1933)." *Jordan*, 156 W.Va. at 163, 191 S.E.2d at 500. *See also Dickerson v. State Workmen's Compensation Commissioner*, 154 W.Va. 7, 10, 173 S.E.2d 388, 391 (1970).

This Court has recognized that: "One does not have to be struck by a truck or to be deluged by a slate fall to receive a compensable injury within the contemplation of our compensation law.... [W]hen considering compensability under the compensation law an accident need not be a visible happening; it may be an unusual or unexpected result attending the operation or performance of a usual or necessary act or event." *Penning-*

ton v. State Workmen's Compensation Commissioner*, 159 W.Va. 370, 374, 222 S.E.2d 579, 581 (1976) (citation omitted). We have also previously determined that a definite, isolated, fortuitous occurrence may occur over a period of time. "Disability, due to shock, exposure, and exhaustion, directly attributable to claimant's having become lost in a coal mine for a period of seven days, is the result of a 'personal injury' within the meaning of the Compensation Act (Code 1931, 23–4–1)." Syl. pt. 1, *Montgomery v. State Compensation Commissioner*, 116 W.Va. 44, 178 S.E. 425 (1935). *See also* syl. pt. 1, *Lockhart v. State Compensation Commissioner*, 115 W.Va. 144, 174 S.E. 780 (1934) ("Paint poisoning contracted from a single exposure during a five-hour period constitutes a compensable injury under the Workmen's Compensation Act (Code 1931, 23–1–1 et seq.)"); and *Adams v. G.C. Murphy Company, a Corporation*, 115 W.Va. 122, 125–26, 174 S.E. 794, 795 (1934) (Determined under early workers' compensation legislation, found that employee who was exposed to carbon monoxide for approximately three months while working in a small kitchen that was not properly ventilated had a compensable injury as her disability was "attributable to exposure extending through a course of employment.").

However, none of these cases addressed the *fear of contracting a disease* or the statutory requirements with respect to workers' compensation claims for occupational pneumoconiosis and other occupational diseases. Even if, for the purposes of analysis, we credit the conclusion that appellants' lungs have indeed been insulted by the inhalation of asbestos fibers, and that such an insult has resulted in the *fear* of contracting occupational pneumoconiosis or another occupational disease, with the attendant loss of sleep and other effects of which appellants complain, the cited cases provide no authority from which we can conclude, as a matter of law, that the Workers' Compensation Act provides benefits for the fear of contracting occupational pneumoconiosis or some other occupational disease. To conclude that such circumstances make out a compensable claim would, in our view, obliterate the clear requirements of W.Va.Code § 23–4–1 that a

claimant seeking benefits by reason of an occupational disease must demonstrate the *present* existence of such disease and, in the case of a claim for occupational pneumoconiosis, that the claimant *presently* suffers from such disease and meets the statutory time requirements for exposure generally, and in this State, particularly. From the record before us, it appears that appellants deny that any of them are presently suffering from occupational pneumoconiosis or that any have suffered a perceptible aggravation of an existing occupational pneumoconiosis as a result of their exposure to asbestos at Hundred High School. We believe that appellee Board must prove the occupational disease or occupational pneumoconiosis criteria set forth in W.Va.Code § 23–4–1, including the present existence of disease, to establish its defense that appellants' physical trauma and insult arising from breathing asbestos fibers raises a claim that is compensable under workers' compensation.

We recall also that the statute sets forth very specific criteria that must be met in order to have a claim of injury from occupational disease or occupational pneumoconiosis. To conclude that a claim would be compensable without meeting these specific statutory requirements, solely for the *fear* of contracting occupational pneumoconiosis or another occupational disease, would convert substantially every case of exposure to, and insult by, asbestos or other dust carried agents into a currently compensable workers'˙ compensation case, notwithstanding the more stringent requirements for such claims set forth by law.

Mental-Physical and Mental–Mental Claim

■ With respect to immunity, appellee Board argues finally that appellants' mental conditions—their fear of contracting an occupational disease or occupational pneumoconiosis—have produced certain physical manifestations, resulting in an injury compensable under workers' compensation as a mental-physical claim or, in the alternative, that the workers suffer a so-called mental-mental condition, compensable under the workers' compensation law as it existed at the time of the injury. Appellee relies on *Bennett v. Buckner*, 150 W.Va. 648, 149

S.E.2d 201 (1966), in support of its argument that appellants have a compensable mental-physical claim. Further, appellee relies on *Breeden v. Workmen's Compensation Commissioner*, 168 W.Va. 573, 285 S.E.2d 398 (1981), in support of its arguments regarding both a mental-physical and mental-mental claim.

*Bennett* involved a civil suit filed by one employee against another for an injury sustained on the premises of the employer. The primary issue before the Court was whether the defendant employee was entitled to immunity because the employer subscribed to the workmen's compensation fund. The Court's discussion focused upon its finding that the injury was compensable because it was sustained "within the 'zone of employment.' " *Bennett*, 150 W.Va. at 652, 149 S.E.2d at 204. Appellee's reliance on this case apparently rests upon a comment in the statement of facts that "plaintiff became fearful that the defendant was losing control of the pickup truck, jumped from it and, as a consequence sustained the personal injuries . . . ." *Id.* at 650, 149 S.E.2d at 202. Other than this single comment, the Court did not discuss the plaintiff's mental condition or its relationship to compensability. Appellants in this case are suing for the fear of contracting an asbestos-related disease or occupational pneumoconiosis. As discussed above, any condition that results from the inhalation of asbestos particles or that is based upon some other claim of occupational disease must be evaluated under the statutory criteria set forth for such claims, including the requirement that the disease has been *presently* contracted.

In *Breeden*, the claimant filed a workers' compensation claim for a mental disability which she suffered after being subjected to continuous and intentional harassment from her immediate supervisor. In that case, we held that "[a]n employee who sustains mental or emotional injury which occurs as a result of continuous and intentional harassment and humiliation from her supervisor extending over a period of time has suffered a personal injury as required by W.Va.Code § 23–4–1 (1981 Replacement Vol.)." Syl. pt. 2, *Breeden v. Workmen's Compensation Commis-*

*sioner*, 168 W.Va. 573, 285 S.E.2d 398 (1981). Thereafter, in 1993, the West Virginia Legislature rejected the compensability of mental-mental claims when it added W.Va.Code § 23–4–1f [14] to the workers' compensation statute. In light of the narrow language used by the *Breeden* Court, the Legislature's subsequent rejection of mental-mental claims, and the clear statutory requirements for establishing a claim for occupational diseases or occupational pneumoconiosis, we decline to broaden our holding in *Breeden* to include the *fear* of contracting an occupational disease or occupational pneumoconiosis.

■ In summary, we conclude that, standing alone, the physical trauma or insult of inhaling asbestos fibers or other dustborne particles does not constitute an injury under W.Va.Code § 23–4–1, absent the further showing that occupational pneumoconiosis has been contracted after exposure for the time required by statute.[15] Accordingly, in order for the appellee Board to establish immunity under W.Va.Code § 29–12A–5(a)(11) as to any of appellants, it must show that the particular appellant has contracted occupational pneumoconiosis as a result of the exposure at Hundred High School. Additionally, the Board must show that the particular appellant meets the exposure requirements set forth in W.Va.Code § 23–4–1 for occupational pneumoconiosis.[16] Nothing in the record before us suggests that appel-

lee Board can meet those requirements with respect to any appellants.

## COMMON LAW EMOTIONAL DISTRESS CLAIMS

Appellants' complaint alleged negligent and intentional infliction of emotional distress. With regard to their claim of negligent infliction of emotional distress, the court below determined that in order to recover, appellants must establish a physical injury.[17] Appellants assert that West Virginia has abandoned the "physical injuries" requirement as a prerequisite for negligent infliction of emotional distress when there has been an actual exposure to the disease. Appellants argue that in such case physical injury is not the controlling issue in determining whether recovery may be had for the fear of contracting the disease; rather, they argue, the test is whether such fear is reasonable under the circumstances. Appellants assert that they have met that test by their offer of uncontroverted evidence of an actual exposure to asbestos, which they assert puts them at significant risk of contracting an asbestos-related disease.

Appellants rely in part on *Johnson v. West Virginia University Hospitals, Inc.*, 186 W.Va. 648, 413 S.E.2d 889 (1991). In *Johnson*, we concluded that an action for negligent infliction of emotional distress could be

---

**14.** West Virginia Code § 23–4–1f states:

For the purposes of this chapter, no alleged injury or disease shall be recognized as a compensable injury or disease which was solely caused by nonphysical means and which did not result in any physical injury or disease to the person claiming benefits. It is the purpose of this section to clarify that so-called mental-mental claims are not compensable under this chapter.

**15.** Nothing in the record before us suggests that any of the appellants' employers provide workers' compensation coverage under any workers' compensation statute or employer's liability law other than the West Virginia Workers' Compensation Act, W.Va.Code § 23–1–1, *et seq.*

**16.** While we have discussed other occupational diseases in the course of this opinion, the facts of the case before us relate to the fear of contracting occupational pneumoconiosis, as defined W.Va.Code § 23–4–1, to include dust-borne risks generally and asbestosis, particularly.

**17.** The trial court concluded that if appellants established an injury, the Board would be entitled to the immunity discussed above. Because our holding today determines that the fear of contracting an occupational disease or occupational pneumoconiosis is not covered by workers' compensation, we recognize that we are leaving open the possibility that appellants will choose to prove that the alleged negligent infliction of emotional distress resulted from physical injury to their lungs, i.e., the insult of the asbestos fibers in their lungs. Ironically, should appellants choose to adopt this approach, they will in essence adopt the approach first asserted by the Board. However, for the reasons previously stated, the establishment of that particular physical injury would not establish a compensable workers' compensation claim unless the additional statutory requirements for occupational pneumoconiosis or an other occupational disease were also established by appellee Board.

maintained where exposure to the AIDS virus had been sufficiently shown when it was proved that the plaintiff had been physically injured by being bitten by an AIDS victim and the plaintiff's blood came into contact with that of the AIDS victim as a result of the bite.[18] Appellees respond that the deciding factor in *Johnson* was plaintiff's physical injury, the bite, rather than exposure to the risk of a disease.

Appellants also rely on *Ricottilli v. Summersville Memorial Hospital*, 188 W.Va. 674, 425 S.E.2d 629 (1992). That case represents a transition from our earlier law requiring that a claim for negligent infliction of emotional distress be accompanied by demonstrable physical injuries. West Virginia had previously confronted the physical injuries issue in *Monteleone v. Co-Operative Transit Co.*, 128 W.Va. 340, 36 S.E.2d 475 (1945), *overruled Heldreth v. Marrs*, 188 W.Va. 481, 425 S.E.2d 157 (1992). In that case, the plaintiff was riding in a car that was struck by a trolley wire that had broken free from above. When the wire struck the car, it shattered the windshield and plaintiff received a cut on her face that was "about the size of a pimple." The *Monteleone* Court concluded that "[t]here can be no recovery in tort for an emotional and mental trouble alone without ascertainable physical injuries arising therefrom, ... through the simple negligence of the defendant, when the defendant's wrongful conduct has caused no impact resulting in substantial bodily injury." Syllabus, *Id.*

More recently, having decided *Gregory* and *Johnson* on other grounds, we revisited this issue in *Heldreth v. Marrs*, 188 W.Va. 481, 425 S.E.2d 157 (1992). In *Heldreth* we recognized that "this Court's view on the issue of plaintiff recovery for the negligent infliction of emotional distress has never been fully developed." *Id.* at 484, 425 S.E.2d at 160. The *Heldreth* Court observed that cases following *Monteleone v. Co-Operative Transit Co.* indicated a general rule that, absent a physical injury or intentional tort, there is no allowable recovery for negligent infliction of emotional distress. *Id.*[19] Nevertheless, the *Heldreth* Court acknowledged a trend in other courts toward abandoning the rule prohibiting recovery absent physical injury and determined that the rule established in *Monteleone* was "quite simply, outdated." *Heldreth* at 485, 425 S.E.2d at 161. The Court commented that "the *Monteleone* court, in 1945, did not fully envision the advancements that were ultimately made in the medical and psychiatric sciences, which have been recognized by other courts, that have enabled physicians to diagnose serious emotional distress and identify malingers." *Id.* (citations omitted). The Court then held that:

A defendant may be held liable for negligently causing a plaintiff to experience serious emotional distress, after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct, even though such distress did not result in physical injury, if the serious emotional distress was reasonably foreseeable. To the extent that *Monteleone v. Co-Operative Transit Co.*, 128 W.Va. 340, 36 S.E.2d 475 (1945), is inconsistent with our holding in cases of plaintiff recovery for negligent infliction of emotional distress, it is overruled.

*Id.* at syl. pt. 1, 36 S.E.2d 475.

*Ricottilli v. Summersville Memorial Hospital*, 188 W.Va. 674, 425 S.E.2d 629 (1992),

---

**18.** Conversely, a short time before *Johnson*, this Court denied recovery in *Funeral Services By Gregory, Inc. v. Bluefield Community Hospital*, 186 W.Va. 424, 413 S.E.2d 79 (1991), *overruled on other grounds, Courtney v. Courtney*, 190 W.Va. 126, 437 S.E.2d 436 (1993). In *Gregory*, a mortician sought recovery for the fear of contracting AIDS after being given the body of an AIDS victim to prepare for burial. We held that the fear of contracting a disease was not actionable in the absence of evidence of actual exposure to the disease causing agent (the AIDS virus). Also, it should be noted that no physical injury to the plaintiff was shown in *Gregory*.

**19.** The *Heldreth* Court also observed that "we noted in *Belcher v. Goins*, 184 W.Va. 395, 408, 400 S.E.2d 830, 843 (1990) and in *Harless v. First National Bank*, 169 W.Va. 673, 689, 289 S.E.2d 692, 702 (1982), although not central to the decision in those cases, that a cause of action for negligent infliction of emotional distress may lie where the plaintiff witnesses a physical injury to a closely related person, suffers mental anguish that manifests itself as a physical injury and is 'within the zone of danger.'" *Id.* at 484, 425 S.E.2d at 160 (footnote omitted). However, the *Heldreth* Court went on to reject the zone of danger rule.

the principal case upon which appellants rely, was decided four days after *Heldreth*. This Court, in an opinion written by Justice Workman, held there that "[a]n individual may recover for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious." *Id.* at syl. pt. 2, 425 S.E.2d 157.

 The court below opined that *Ricottilli* did not apply to the case *sub judice* because the holding in *Ricottilli* was limited to cases involving the "dead body exception" to the rule prohibiting recovery for emotional distress absent an injury. While it does appear that the decision in *Ricottilli* raised the issue of applying the "dead body exception" and proceeded to apply the exception to the facts of that case, we believe that the holding in the case, expressed in syllabus point 2, quoted above, clearly indicated a progression by this Court away from the requirement of a precedent physical injury in order to recover in cases involving negligent infliction of emotional distress. Such a progression in other courts has been recognized in Stuart M. Speiser, et al., *The American Law of Torts*, § 16:2, at 949–50 (1987):

> Although there are courts that still adhere to the early view, the scholars assert that such artificial barriers to recovery are unnecessary. The unqualified requirement of physical injury is no longer justifiable. . . . It supposedly serves to satisfy the cynic that the claim of emotional distress is genuine. Yet we perceive two significant difficulties with the scheme. First, the classification is both overinclusive and underinclusive when viewed in the light of its purported purpose of screening false claims. It is overinclusive in permitting recovery for emotional distress when the suffering accompanies or results in any physical injury whatever, no matter how trivial. If physical injury, however slight, provides the ticket for admission to the courthouse, it is difficult for advocates of the "floodgates" premonition to deny that the doors are already wide open. More significantly, the classification is underinclusive because it mechanically denies

court access to claims that may well be valid and could be proved if the plaintiffs were permitted to go to trial. (Footnotes omitted.)

Therefore, we hold that the principle set forth in syllabus point 2 of *Ricottilli v. Summersville Memorial Hospital* is applicable in a cause of action for negligent infliction of emotional distress. Thus, we reiterate that "[a]n individual may recover for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious." Syl. pt. 2, *Ricottilli v. Summersville Memorial Hospital*, 188 W.Va. 674, 425 S.E.2d 629 (1992).

 However, we emphasize the requirements that a claim for emotional distress without an accompanying physical injury can only be successfully maintained upon a showing by the plaintiffs in such an action of facts sufficient to guarantee that the claim is not spurious and upon a showing that the emotional distress is undoubtedly real and serious. As this Court recognized in *Ricottilli:*

> [w]here the guarantee can be found, and the mental distress is undoubtedly real and serious, there may be no good reason to deny recovery. But cases will obviously be infrequent in which "mental disturbance," not so severe as to cause physical harm, will clearly be a serious wrong worthy of redress and sufficiently attested by the circumstances of the case.

*Id.,* at 680, 425 S.E.2d at 635 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 54, at 362 (5th ed. 1984 & Supp.1988)). In the case before us, the trial court must be concerned with both the guarantee against a spurious action and a showing of real and serious emotional distress. The burden rests on appellants to meet these requirements.

 To determine the extent of plaintiff's burden to show that his or her claim is not spurious and that he or she suffers from real and serious emotional distress, we again look to this Court's opinion in *Heldreth v. Marrs*. While the Court's holding in *Heldreth* was limited to cases involving emotional distress that resulted when a plaintiff witnessed the

critical injury or death of a person closely related to the plaintiff, we believe that certain principles set forth in that case are applicable to a cause of action resulting from the fear of contracting a disease. The *Heldreth* Court held:

[A] plaintiff's right to recover for the negligent infliction of emotional distress, after witnessing a person closely related to the plaintiff suffer critical injury or death as a result of defendant's negligent conduct, is premised upon the traditional negligence test of foreseeability. A plaintiff is required to prove under this test that his or her serious emotional distress was reasonably foreseeable, that the defendant's negligent conduct caused the victim to suffer critical injury or death, and that the plaintiff suffered serious emotional distress as a direct result of witnessing the victim's critical injury or death.

*Heldreth v. Marrs,* 188 W.Va. at 494, 425 S.E.2d at 169. Similarly, we hold that in order to recover for negligent infliction of emotional distress based upon the fear of contracting a disease, a plaintiff must prove that he or she was actually exposed to the disease by the negligent conduct of the defendant, that his or her serious emotional distress was reasonably foreseeable, and that he or she actually suffered serious emotional distress as a direct result of the exposure.

■ The *Heldreth* Court also discussed the factors necessary to proving the foreseeability of serious emotional distress when a plaintiff witnessed the critical injury or death of· a person closely related to the plaintiff. While the factors discussed there are not directly helpful where the claim is based upon the fear of contracting a disease, they do suggest two factors which we believe to be essential to such a claim based solely on the fear of contracting a disease. We conclude that, in addition to other factors which may be adduced in evidence to prove that serious emotional distress arising from the fear of contracting a disease is reasonably foreseeable, the evidence must show first, that the exposure upon which the claim is based raises a medically established possibility of contracting a disease, and second, that the disease will produce death or substantial

disability requiring prolonged treatment to mitigate and manage or promising imminent death.

With regard to establishing serious emotional distress, the *Heldreth* Court recognized that "serious emotional distress can be diagnosed even in the absence of any physical manifestation, and can be proven with medical and psychiatric evidence. Furthermore, any physical injury resulting from the emotional distress is further evidence of the degree of emotional distress suffered. *Paugh v. Hanks,* [6 Ohio St.3d 72] 451 N.E.2d [759] at 765 [ (1983) ]." *Heldreth,* 188 W.Va. at 490, 425 S.E.2d at 166. The *Heldreth* Court further commented that:

[W]e believe, in determining the "seriousness" of the emotional distress, consideration should also be given to whether the particular plaintiff is a "reasonable person, normally constituted." More specifically, we recognize that the *Paugh* court found that "serious emotional distress may be found where a *reasonable person, normally constituted,* would be unable to cope adequately with the mental distress engendered by the circumstances of the case." 451 N.E.2d at 765 (citations omitted) (emphasis added);.... A "reasonable person," in this context, has been found to be an "ordinarily sensitive person and not the supersensitive, 'eggshell psyche' plaintiff."

*Id.* at 490, 425 S.E.2d at 166 (citations omitted). In addition, the Court observed that "[t]he reasonableness of the plaintiff's reaction to the event will normally be a jury question." *Id.* at 491, 425 S.E.2d at 167.

■ In light of the *Heldreth* guidance, we hold that serious emotional distress based upon the fear of contracting a disease is a question of fact to be determined by the trier of fact. It may be proven with medical and psychiatric evidence, based on a diagnosis made with or without physical manifestations of the distress; however, any physical injury resulting from the emotional distress is further evidence of the degree of emotional distress suffered. In determining "seriousness", consideration should be given to whether the particular plaintiff is a "reasonable person, normally constituted". For the purposes of such consideration, a reasonable

person is an ordinarily sensitive person and not a supersensitive person.

 Finally, we note that appellants plead a claim of intentional infliction of emotional distress. That claim does not, in any event, require an incidental physical injury. *See Harless v. First National Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982). Such a claim does, however, require proof of the requisite intent. No mere showing of neglect will satisfy the element of intent necessary to an action for intentional infliction of emotional distress. Nor do we see in the record before us evidence of outrageous conduct sufficient to support the allegation of intentional conduct. Nevertheless, since this issue and those essential to the claim of negligent infliction of emotional distress just discussed may be further developed in this litigation as it proceeds, we leave those issues for further decision by the trial court.

Accordingly, we conclude that the trial court erred in granting summary judgment to appellee Board with respect to the claims alleged by appellants and will reverse and remand for further proceedings consistent with this opinion.

## APPELLEE'S CROSS ASSIGNMENTS OF ERROR

 By way of cross assignment of error, appellee Board complains that the circuit court erred by ruling that the Board was not statutorily immune to appellants' claims under W.Va.Code § 29–12A–5(a)(10), which states:

(a) A political subdivision is immune from liability if a loss or claim results from:

\* \* \* \* \* \*

(10) Inspection powers or functions, including failure to make an inspection, or making an inadequate inspection, of any property, real or personal, to determine whether the property complies with or vio-

lates any law or contains a hazard to health or safety....

Appellee contends that W.Va.Code § 29–12A–5(a)(10) provides immunity to the Board for claims resulting from its inspection powers. Appellee submits that the Tort Claims Act provides immunity for two types of inspections: (1) inspections to determine whether the property complies with or violates any law; or (2) inspections of buildings for hazards to health or safety. Thus, appellee argues that the Tort Claims Act clearly contemplates immunity in the instant claim.

Appellants respond that W.Va.Code § 29–12A–4(c)(4) provides that political subdivisions "are liable for injury ... to persons ... that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used by such political subdivisions...." Moreover, under general negligence law, the Board, as a premises owner, must provide a reasonably safe work place and warn its invitees of latent dangers. Appellants contend that W.Va.Code § 29–12A–5(a)(10) was not intended to limit the Board's duty to maintain its premises or its liability for a breach of that duty. Rather, the immunity under that section is given for the exercise of a specific governmental power, namely inspecting and permitting the premises of others.

 We agree with the lower court's finding that W.Va.Code § 29–12A–5(a)(10) clearly deals with inspection functions related to assuring compliance with a law or ordinance of the political subdivision, such as housing, fire, zoning, health, etc. With a few exceptions, the majority of the seventeen immunities from liability contained in W.Va. Code § 29–12A–5(a) are related to the public service functions of a political subdivision.[20]

"'It is a fundamental rule of construction that, in accordance with the maxim *noscitur a sociis,* the meaning of a word or phrase may be ascertained by reference to

20. West Virginia Code § 29–12A–5(a) provides:
(a) A political subdivision is immune from liability if a loss or claim results from:
(1) Legislative or quasi-legislative functions;
(2) Judicial, quasi-judicial or prosecutorial functions;
(3) Execution or enforcement of the lawful orders of any court;

(4) Adoption or failure to adopt a law, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy;
(5) Civil disobedience, riot, insurrection or rebellion or the failure to provide, or the method of providing, police, law enforcement or fire protection;

the meaning of other words or phrases with which it is associated. Language, although apparently general, may be limited in its operation or effect where it may be gathered from the intent and purpose of the statute that it was designed to apply only to certain persons or things, or was to operate only under certain conditions.' Syllabus point 4, *Wolfe v. Forbes*, 159 W.Va. 34, 217 S.E.2d 899 (1975)." Syllabus point 1, *Banner Printing Co. v. Bykota Corp.*, 182 W.Va. 488, 388 S.E.2d 844 (1989).

Syl. pt. 1, *Darlington v. Mangum*, 192 W.Va. 112, 450 S.E.2d 809 (1994). Thus, we conclude that W.Va.Code § 29–12A–5(a)(10) provides immunity for a political subdivision's inspection functions related to assuring compliance with a law or ordinance of the political subdivision including, but not limited to, housing, fire, zoning, and health.

▪ Appellee next argues that the circuit court erred by ruling that the derivative claims of appellants' wives and children were not statutorily barred. Appellee contends the Tort Claims Act also affords immunity for all derivative claims arising from the alleged exposure of appellant/workers. Appellee asserts that this argument is supported by *O'Dell v. Town of Gauley Bridge*, 188 W.Va. 596, 425 S.E.2d 551 (1992), in which this Court held that W.Va.Code § 29–12A–5(a)(11) "provides immunity to a political subdivision for *all damages* arising from a tortious injury, not merely for those compensated by workers' compensation." *Id.* at 610, 425 S.E.2d at 565 (emphasis added). Appellee does not dispute that any direct exposure claims by the wives and children are not barred by immunity under the Tort Claims Act.

Appellants respond that the families of the workers have a claim in their own right, not a derivative claim. Consequently, appellants contend, the trial court correctly determined that the families' claims were not covered by workers' compensation and the Board was, therefore, not immune under W.Va.Code § 29–12A–5(a)(11).

In its order dated April 20, 1995, granting summary judgment, the court commented with regard to its discussion of the workers' compensation issues involved in this claim that "[t]his argument does not apply to the wives and children of the workmen who were not covered by The Act." We observe that appellants' complaint contains two separate allegations with regard to the members of the workers' households. The complaint alleged derivative claims for loss of love, society, comfort, companionship, and services that would not survive immunity under W.Va.Code § 29–12A–5(a)(11), if the Board could establish such immunity as set forth above. However, the complaint also alleges independent claims that "the plaintiffs *and members of their households* were subject to a high degree of risk of contracting ...

(6) Snow or ice conditions or temporary or natural conditions on any public way or other public place due to weather conditions, unless the condition is affirmatively caused by the negligent act of a political subdivision;

(7) Natural conditions of unimproved property of the political subdivision;

(8) Assessment or collection of taxes lawfully imposed or special assessments, license or registration fees or other fees or charges imposed by law;

(9) Licensing powers or functions including, but not limited to, the issuance, denial, suspension or revocation of or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authority;

(10) Inspection powers or functions, including failure to make an inspection, or making an inadequate inspection, of any property, real or personal, to determine whether the property complies with or violates any law or contains a hazard to health or safety;

(11) Any claim covered by any workers' compensation law or any employer's liability law;

(12) Misrepresentation, if unintentional;

(13) Any court-ordered or administratively approved work release or treatment or rehabilitation program;

(14) Provision, equipping, lawful operation or maintenance of any prison, jail or correctional facility, or injures resulting from the parole or escape of a prisoner;

(15) Any claim or action based on the theory of manufacturer's products liability or breach of warranty or merchantability or fitness for a specific purpose, either expressed or implied;

(16) The operation of dumps, sanitary landfills, and facilities where conducted directly by a political subdivision; or

(17) The issuance of revenue bonds or the refusal to issue revenue bonds.

pneumoconiosis...." These independent claims are not subject to any immunity the Board may have regarding the workers' claims.[21] It is not clear from the court's order whether its comment was related to both of the claims involving the members of the workers' households, or whether it was related only to the independent claims. However, in light of the fact that we have reversed the court's ruling granting summary judgment, we need not decide this issue. We note only that the derivative claims for loss of love, society, comfort, companionship, and services stand or fall with appellants' claims and that the remaining claims by members of the household relative to their fear of contracting disease are subject to the provisions of this opinion, particularly those relating to the requirement of proving serious emotional distress.

## CONCLUSION

For the foregoing reasons, we find that the court erred in granting summary judgment on behalf of the Wetzel County Board of Education with regard to the claims of the appellants based upon its finding that appellants suffered a compensable "injury." Having reviewed the record submitted to us, we conclude that the evidence before the court below was insufficient upon which to find, as a matter of law, that appellants' claim is covered by our workers' compensation statutes. We have previously stated that "the use of summary judgment is disfavored where development of the facts of a case is desirable so as to clarify the application of the law." *Lengyel v. Lint*, 167 W.Va. 272, 281, 280 S.E.2d 66, 71 (1981) (citation omitted).

We, therefore, reverse the May 22, 1995 order of the Circuit Court of Wetzel County and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

RECHT, J., sitting by temporary assignment.

---

21. We note that questions regarding the merits of these claims are not presently before us.