IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

FILED

June 11, 2024

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-0135

_____

ROCKSPRING DEVELOPMENT, INC.,
Petitioner,

V.

RANDY BROWN,
Respondent.

_____

Appeal from the West Virginia Workers' Compensation Board of Review
Claim No. 2016017091
Appeal No. 2057120

AFFIRMED

_____

Submitted: April 16, 2024
Filed: June 11, 2024

Sean Harter, Esq.
Scott Depot, West Virginia
Attorney for the Petitioner

J. Robert Weaver, Esq.
Maroney, Williams, Weaver & Pancake,
PLLC
Charleston, West Virginia
Attorney for the Respondent

JUSTICE BUNN delivered the Opinion of the Court.

CHIEF JUSTICE ARMSTEAD concurs and may write separately.

**SYLLABUS BY THE COURT**

1. "When reviewing a decision of the West Virginia Workers' Compensation Board of Review . . . , this Court will give deference to the Board's findings of fact and will review de novo its legal conclusions. The decision of the Board may be reversed or modified only if it (1) is in clear violation of a constitutional or statutory provision; (2) is clearly the result of erroneous conclusions of law; or (3) is based upon material findings of fact that are clearly wrong." Syllabus point 1, in part, *Moran v. Rosciti Construction Co., LLC*, 240 W. Va. 692, 815 S.E.2d 503 (2018).

2. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syllabus point 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968).

**BUNN, Justice:**

Respondent Randy Brown had previously been granted a 30% permanent partial disability ("PPD") award after contracting occupational pneumoconiosis ("OP"). Mr. Brown later sought an increase in his award and filed a petition to reopen his claim in 2018. The Occupational Pneumoconiosis Board ("OP Board") examined Mr. Brown and determined that sufficient evidence justified an additional 20% impairment for a total impairment rating of 50%. Based upon the OP Board's findings, the claims administrator granted an additional 20% PPD award.[1] Petitioner Rockspring Development, Inc., ("Rockspring") protested this decision to the West Virginia Workers' Compensation Office of Judges ("Office of Judges"), which affirmed the claims administrator's decision. Rockspring then appealed to the West Virginia Workers' Compensation Board of Review ("Board of Review"). By order dated January 21, 2022, the Board of Review affirmed the Office of Judges' decision affirming the claims administrator's decision to grant Mr. Brown an additional 20% PPD, for a total of 50% PPD award.

On appeal to this Court, Rockspring asserts that during the pendency of the claim process, Mr. Brown underwent a bilateral lung transplant and, following the

---

[1] In this matter, the amount of PPD awarded equals the amount of impairment found. *See* W. Va. Code § 23-4-6(i) (eff. 2005), in relevant part ("For the purposes of this chapter, . . . [t]he occupational pneumoconiosis board created pursuant to section eight-a [§ 23-4-8a] of this article shall premise its decisions on the degree of pulmonary function impairment that claimants suffer solely upon whole body medical impairment. . . . Once the degree of medical impairment has been determined, that degree of impairment shall be the degree of permanent partial disability that shall be awarded to the claimant.").

1

transplant, Mr. Brown's pulmonary function testing and x-ray reports showed no evidence of OP. Consequently, Rockspring argues that the Board of Review was clearly wrong in affirming the additional 20% PPD award because Mr. Brown no longer has OP or any pulmonary impairment from OP. Under the limited facts and circumstances presented in this case, we disagree and affirm the Board of Review's additional 20% PPD award.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Mr. Brown, a former underground coal miner with over thirty-eight years of coal dust exposure, contracted OP. He applied for workers' compensation benefits, and, in August 2016, the claims administrator granted him a 30% PPD award based upon his OP. On October 18, 2017, Mr. Brown underwent a pulmonary function study at Vanderbilt University Medical Center ("Vanderbilt"). The interpreting physician diagnosed Mr. Brown with a severe obstructive ventilatory defect, a mild restrictive ventilatory defect, and a moderate gas transfer defect. The study demonstrated that his "flow-volume loop pattern [wa]s consistent with chronic obstructive pulmonary disease." Because the results indicated that his OP had worsened, Mr. Brown subsequently requested that his PPD claim be reopened. The claims administrator referred him to the OP Board for evaluation.

On September 25, 2018, members of the OP Board examined Mr. Brown and certain of his relevant medical records.[2] The OP Board noted that Mr. Brown had been previously diagnosed with asthma and chronic obstructive pulmonary disease in 2015, and he was treated for pneumonia in 2017. Mr. Brown reported to the OP Board that he had been on a lung transplant list for several years due to progressive massive fibrosis. When comparing September 2018 chest x-ray studies to the OP Board's previous 2016 x-ray studies, the OP Board determined that Mr. Brown's lungs showed "nodular fibrosis consistent with [OP] with areas of coalescence in the perihilar regions bilaterally" and that these areas "have increased slightly from previous examination consistent with progressive massive pulmonary fibrosis." The OP Board further relied on the October 2017 Vanderbilt pulmonary function testing, which demonstrated significant impairment.[3] Ultimately, the OP Board concluded that sufficient evidence justified an additional 20% impairment rating for Mr. Brown's diagnosis of OP, for a total of 50% when combined with Mr. Brown's previous 30% impairment.

---

[2] Neither party raises an objection to the medical records reviewed and relied upon in the OP Board's 2018 decision.

[3] Mr. Brown also underwent pulmonary function testing at Charleston Area Medical Center's Occupational Lung Center ("CAMC") on September 25, 2018. The OP Board deemed those results invalid for determining impairment. Rockspring does not contest the OP Board's reliance on the October 2017 Vanderbilt study rather than the September 2018 CAMC study.

On December 6, 2018, the claims administrator granted Mr. Brown an additional 20% PPD award. Rockspring protested this order to the Office of Judges. During the pendency of the protest proceedings, Mr. Brown received a bilateral lung transplant on May 3, 2020.[4] Following the surgery, Mr. Brown submitted to a pulmonary function study at Vanderbilt on August 3, 2020. The interpreting physician found no obstruction present in Mr. Brown's lungs. Because the study occurred after Rockspring's evidentiary development deadline, Rockspring moved the Office of Judges to admit the medical records regarding Mr. Brown's lung transplant and subsequent testing into evidence. The Office of Judges granted the motion.

At the Office of Judges' hearing on Rockspring's protest of the claims administrator's decision,[5] radiologist John Willis, M.D., testified on behalf of the OP Board. Dr. Willis testified that he reviewed the August 2020 post-transplant x-ray from Vanderbilt, and opined that Mr. Brown's lungs looked normal with no evidence of OP.

Next, Jack Kinder, M.D., testified on behalf of the OP Board stating that he agreed with Dr. Willis's testimony. Dr. Kinder indicated that members of the OP Board examined Mr. Brown in September 2018, and based on that examination, the OP Board

---

[4] Rockspring asserts that it authorized and paid for the transplant surgery.

[5] The Office of Judges originally set this matter for a final OP Board hearing on March 3, 2021, but due to the complexity of the issue, continued the hearing to May 5, 2021.

recommended an additional 20% impairment for a total of 50% impairment. He opined that the testing conducted by the OP Board in September 2018 was not reproducible and was invalid for determining impairment.[6] The OP Board, therefore, used the October 2017 Vanderbilt study to determine that Mr. Brown had a total of 50% impairment.

Dr. Kinder testified that he reviewed the August 3, 2020, pulmonary function study from Vanderbilt following Mr. Brown's bilateral lung transplant. He stated that the August 2020 study represented a normal study for someone post-transplant. While he agreed that the August 2020 study was within normal limits, Dr. Kinder opined that Mr. Brown was nevertheless entitled to a 50% impairment rating. He explained that while Mr. Brown's lung function was better at the present time, "[i]n a transplant person, 50% of those people are alive at five years. . . . . [T]he symptoms and suffering associated with their lung disease that's improved by [a] lung transplant, [however,] the overall longevity of someone who has a lung transplant . . . is still decreased." Dr. Kinder testified that Mr. Brown would be required to take post-transplant medications, which would also affect Mr. Brown for the rest of his life and create an increased risk of several other diseases. Dr. Kinder acknowledged that while he was not a transplant surgeon, he provided care for transplant patients, and he believed that Mr. Brown clinically "still suffers." Dr. Kinder also stated that OP is a permanent disease that does not improve over time. He explained that, in his opinion, the appropriate impairment recommendation should be based upon an

---

[6] *See supra* note 3.

individual's pre-transplant status, and Mr. Brown was entitled to an additional 20% impairment for a total of 50% impairment. Finally, Bradley Henry, M.D., testified on behalf of the OP Board and concurred with Drs. Willis and Kinder. Rockspring did not call any physicians to refute the testimony of the members of the OP Board.

After reviewing the evidence, the Office of Judges concluded that the findings and conclusions of the OP Board were not clearly wrong, and on June 28, 2021, it affirmed the claims administrator's grant of an additional 20% PPD award for a total PPD award of 50%. The Board of Review adopted the findings of fact and conclusions of law of the Office of Judges and affirmed its order on January 21, 2022.[7]

## II.

### STANDARD OF REVIEW

This Court's standard of review in workers' compensation cases is provided by statute. Pursuant to West Virginia Code § 23-5-15(c) (eff. 2021), we give deference to the Board of Review's "findings, reasoning, and conclusions[.]" Because the Board of Review's decision affirms a "prior ruling by both the commission and the Office of Judges[,]" we apply the following criteria:

> the decision of the board may be reversed or modified by the Supreme Court of Appeals only if the decision is in clear violation of constitutional or statutory provision, is clearly the

---

[7] The Board of Review made two modifications to the Office of Judges' findings of fact. Those modifications are not relevant to this appeal.

6

result of erroneous conclusions of law, or is based upon the board's material misstatement or mischaracterization of particular components of the evidentiary record. The court may not conduct a de novo reweighing of the evidentiary record.

*Id.* § 23-5-15(d), in part. This Court has similarly held that

[w]hen reviewing a decision of the West Virginia Workers' Compensation Board of Review . . . , this Court will give deference to the Board's findings of fact and will review de novo its legal conclusions. The decision of the Board may be reversed or modified only if it (1) is in clear violation of a constitutional or statutory provision; (2) is clearly the result of erroneous conclusions of law; or (3) is based upon material findings of fact that are clearly wrong.

Syl. pt. 1, in part, *Moran v. Rosciti Constr. Co., LLC*, 240 W. Va. 692, 815 S.E.2d 503 (2018).

Moreover, "this Court applies a de novo standard of review to questions of law arising in the context of decisions issued by the Board of Review." *Delbert v. Murray Am. Energy, Inc.*, 247 W. Va. 367, 371, 880 S.E.2d 89, 93 (2022) (quotations and citation omitted). To the extent that this case also requires examination of relevant statutory provisions, we finally note that, "[w]here the issue on an appeal from [a lower tribunal] is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995).

### III.

### DISCUSSION

Rockspring argues that the Board of Review erred by affirming Mr. Brown's 50% PPD award for his OP impairment following Mr. Brown's bilateral lung transplant.[8] Specifically, Rockspring contends that the Board of Review clearly erred because a preponderance of the evidence establishes that Mr. Brown no longer has OP or any pulmonary impairment.[9] Under the specific circumstances of this case and by applying our deferential standard of review, we find that the Board of Review did not err.

This Court must first examine the applicable statutory language regarding OP workers' compensation claims. West Virginia Code § 23-4-1(a) (eff. 2024)[10] provides,

---

[8] Rockspring lists three errors in the assignment of error section of its brief, claiming the Board of Review erred because it: (1) made erroneous conclusions of law, (2) relied on the OP Board's clearly wrong findings, and (3) affirmed a decision of a 50% impairment when members of the OP Board testified that Mr. Brown does not currently have OP. However, the argument section of Rockspring's brief only discusses one general assignment of error: that the Board of Review was clearly wrong and should be reversed because a preponderance of the evidence conclusively establishes that Mr. Brown no longer has OP or any pulmonary impairment. Because Rockspring only addresses one general assignment of error, which incorporates the three specifically identified errors, we address them together.

[9] Pursuant to West Virginia Code § 23-5-12(b), the Board of Review "shall reverse, vacate, or modify" a decision of the Office of Judges if its findings are: (1) in violation of a statute; (2) in excess of statutory authority or jurisdiction; (3) resulted from unlawful procedures; (4) otherwise affected by an error of law; (5) clearly wrong based on the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion.

[10] West Virginia Code § 23-4-1 has been amended several times throughout the duration of Mr. Brown's claims; however, those amendments do not have any bearing

in relevant part, that "workers' compensation benefits shall be paid to the employees of employers subject to this chapter who have received personal injuries in the course of and resulting from their covered employment[.]" Subsection (b) of that statutory provision includes occupational pneumoconiosis[11] as a personal injury. *Id.* This subsection also specifies that "workers' compensation benefits shall be paid to the employees of the employers in whose employment the employees have been exposed to the hazards of occupational pneumoconiosis . . . and have contracted occupational pneumoconiosis[.]"[12] *Id.* Subsection (g) provides, in relevant part, that an employee has "contracted an occupational disease within the meaning of this subsection if the disease or condition has developed to such an extent that it can be diagnosed as an occupational disease." *Id.*

---

on the issues presented in this case. *See* Enrolled Senate Bill 170, 2024 Reg. Sess. (eff. March 8, 2024). Accordingly, for ease of reference, we utilize the most recent version.

[11] West Virginia Code § 23-4-1(d), in relevant part, defines "[o]ccupational pneumoconiosis" as "a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of, and in the course of, the [employee's] employment."

[12] West Virginia Code § 23-4-1(b) contains a proviso that to receive benefits for OP, the employee must have

> been exposed to the hazards of occupational pneumoconiosis in the State of West Virginia over a continuous period of not less than two years during the 10 years immediately preceding the date of his or her last exposure to such hazards, or for any five of the 15 years immediately preceding the date of his or her last exposure.

There is no dispute that Mr. Brown has met this requirement.

9

We have held that "[w]here the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder*, 152 W. Va. 571, 165 S.E.2d 108 (1968); *see also State v. Scruggs*, 242 W. Va. 499, 502, 836 S.E.2d 466, 469 (2019) ("'[W]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed.' *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 587, 466 S.E.2d 424, 438 (1995)."). Neither party argues that the relevant statutory language is vague or ambiguous. Therefore, we apply the statute's plain language as written without interpretation.

Here, Mr. Brown contracted OP based upon his coal dust exposure during his employment as an underground coal miner, and no party disputes his original diagnosis. In fact, Mr. Brown's OP had progressed to such an extent that Rockspring authorized and paid for a bilateral lung transplant. Therefore, applying the plain language of the statute to the undisputed facts of this case, Mr. Brown satisfies the statutory requirement that he has "contracted" OP. *See generally* W. Va. Code § 23-4-1.

To determine a claimant's entitlement to a PPD award for an OP diagnosis, the appropriate degree of impairment must be assessed by the OP Board. This Court has concluded that "[b]enefits . . . cannot be awarded on a diagnosis of OP alone. An impairment is also required." *Pennington v. W. Va. Off. of the Ins. Comm'r*, 241 W. Va. 180, 186, 820 S.E.2d 626, 632 (2018); s*ee also* W. Va. Code § 23-4-6a (eff. 2005)

10

(providing that no PPD shall be awarded "based solely upon a diagnosis of occupational pneumoconiosis, it being the intent of the Legislature to eliminate any permanent partial disability awards for occupational pneumoconiosis without a specific finding of measurable impairment"); Syl. pt. 3, *Kubachka v. State Workmen's Comp. Comm'r*, 163 W. Va. 601, 259 S.E.2d 21 (1979) ("If a Workmen's Compensation claimant has a measurable pulmonary impairment resulting from occupational pneumoconiosis, he is entitled to a permanent partial disability award as a consequence of such impairment."). Furthermore, West Virginia Code § 23-4-6a provides that "the percentage of permanent disability is determined by the degree of medical impairment that is found by the [OP Board]." Similarly, West Virginia Code § 23-4-6(i) (eff. 2005) sets forth the following, in part:

> For the purposes of this chapter, . . . [t]he occupational pneumoconiosis board created pursuant to section eight-a [§ 23-4-8a] of this article shall premise its decisions on the degree of pulmonary function impairment that claimants suffer solely upon whole body medical impairment. . . . Once the degree of medical impairment has been determined, that degree of impairment shall be the degree of permanent partial disability that shall be awarded to the claimant.

Simply put, for a claimant to receive PPD benefits for OP, the OP Board must determine that the claimant has a measurable medical impairment.

While the plain statutory language requires a finding of measurable medical impairment, the applicable statutory provisions do not address the unique factual circumstances of the present case—where the OP board found a claimant had a significant

11

pulmonary function impairment (a total of 50%), but during the claim process the claimant underwent a bilateral lung transplant and, by virtue of the transplant, regained pulmonary function. In other words, the relevant statutes do not indicate, when measuring impairment, whether the decisionmaker should consider the pulmonary function of the pre-transplant lungs or the function of the post-transplant lungs when the transplant occurred during the pendency of the claim proceedings. Our case law is also silent as to this narrow issue involving very unusual timing.[13]

---

[13] As we have reiterated throughout this opinion, the facts and circumstances before us are unique. In fact, neither Rockspring nor Mr. Brown direct us to any other cases from any jurisdiction for guidance. We recognize that other jurisdictions have considered questions regarding impairment levels related to intraocular implants, corneal transplants, and heart transplants. However, those cases do not directly inform our decision of this case because they involve different statutory language and other distinguishable considerations, including the timing of the surgical procedures. *See, e.g.*, *Vitti v. City of Milford*, 249 A.3d 726, 736 (Conn. 2020) (concluding that "the board correctly determined that a functionality analysis of the transplanted heart . . . was appropriate in fashioning the plaintiff's specific indemnity award in the present case because the transplant meant that the plaintiff had not suffered a complete loss of his heart within the meaning of [the applicable statute]"); *Creative Dimensions Grp., Inc. v. Hill*, 430 S.E.2d 718, 722 (Va. Ct. App. 1993) (affirming "the commission's holding that the intraocular lens implant has not eliminated the loss that the claimant sustained, and, as a mere corrective device, the implant should not be considered in determining the extent of claimant's loss"); *Kalhorn v. City of Bellevue*, 420 N.W.2d 713, 717 (Neb. 1988) (determining that an employee whose eye was damaged in an employment-related accident should be compensated based on his condition after injury and before the natural lens was replaced by an intraocular lens implant); *State ex rel. Kroger Co. v. Stover*, 510 N.E.2d 356, 361 (Ohio 1987) (holding that a corneal transplant is a correction to vision and, thus, not considered in determining the percentage of vision actually lost by accident); *Lee Connell Constr. Co. v. Swann*, 327 S.E.2d 222, 223 (Ga. 1985) (equally divided court) (finding that an award for loss of vision should be based upon corrected vision after a lens implant).

Here, the lower tribunals faced a rare set of factual circumstances. Mr. Brown contracted OP, which continued to progress.[14] The OP Board determined that this progression represented an additional 20% impairment. There is nothing in the record to refute Mr. Brown's evidence, and the OP Board's conclusion, that Mr. Brown's condition prior to his lung transplant entitled him to an additional 20% impairment rating. However, while the claim was still pending, Mr. Brown received a bilateral lung transplant. After the deadline to submit evidence had passed, the Office of Judges allowed Rockspring to submit certain medical documentation indicating that Mr. Brown's pulmonary function was normal following the transplant. It is clear that, but for the serendipitous timing of the transplant surgery, i.e., during the pendency of the claim process, and Rockspring's submission of medical documents after the evidentiary development deadline, Rockspring's argument in this case would be baseless.

Furthermore, members of the OP Board provided testimony before the Office of Judges that support its decision to use the pre-transplant pulmonary function testing to determine Mr. Brown's impairment. That testimony includes that Mr. Brown clinically "still suffers" and that, while he had no discernable pulmonary function impairment due to

---

[14] This Court has previously discussed the progressive nature of OP. *See generally Pennington v. W. Va. Off. of the Ins. Comm'r*, 241 W. Va. 180, 820 S.E.2d 626 (2018). Describing OP as a progressive disease is also consistent with the Federal Coal Mine Health and Safety Act's description of OP. *See* 20 C.F.R. § 718.201(c) (recognizing that OP is a "latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure").

the transplant surgery, he faces other medical issues due to the transplant and has a shortened life expectancy.

In support of its argument that Mr. Brown's lung transplant means he no longer has OP or pulmonary impairment, Rockspring relies on Syllabus points four and five of *Marlin v. Bill Rich Construction, Inc.*, 198 W. Va. 635, 482 S.E.2d 620 (1996), where this Court set forth certain guidelines regarding receiving benefits based on a diagnosis of OP:

> 4. West Virginia Code § 23-4-1 requires that one who claims workers' compensation benefits for occupational pneumoconiosis must show: (1) the present existence of the disease or an aggravation of the disease which has been previously contracted and (2) exposure to the risk of occupational pneumoconiosis for a substantial period of time, including at least the specified minimum period of exposure while at work in West Virginia.

> 5. Under the definition and requirements for occupational pneumoconiosis claims set forth in [West Virginia] Code § 23-4-1, it is not sufficient to prove only the *fear* of eventually contracting occupational pneumoconiosis or to show some exposure to the risk of contracting the disease for a period of time less than those periods set out in the statute.

We find those Syllabus points to be distinguishable from the case before us. In *Marlin*, the appellants asserted that "their injuries resulted from the inhalation of asbestos fibers, causing them to *fear* that, in due time, they will contract [OP.]" 198 W. Va. at 646, 482 S.E.2d at 631. Consequently, the *Marlin* Court could not conclude, on the record before it, "that appellants have, *in fact and presently,* contracted occupational

14

pneumoconiosis[.]" *Id.* In the present matter, Mr. Brown's claim is not based upon his *fear* of contracting an occupational disease as in *Marlin* because Mr. Brown did in fact contract OP during his employment after being exposed for the requisite number of years. We, therefore, find *Marlin* distinguishable from the present circumstances, and Rockspring's reliance on *Marlin* is misplaced.

There was undisputed evidence in the record below to demonstrate that Mr. Brown contracted OP and suffered a resulting measurable impairment for many years. In the absence of statutory guidance on whether and how a transplant surgery that occurs during the pendency of the claim impacts an impairment rating, we simply cannot conclude that the Board of Review erred, particularly in light of the deference they are afforded. *See Morton v. W. Va. Off. of Ins. Comm'r*, 231 W. Va. 719, 726, 749 S.E.2d 612, 619 (2013) (per curiam) (concluding that given our required deference and the "absence of an issue-determinative rule of law in this matter, we are hard-pressed to find that the [Board of Review's] determination constitutes a 'clearly' erroneous conclusion of law"). We, therefore, affirm the Board of Review's decision affirming Mr. Brown's additional 20% PPD award.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the January 21, 2022 order of the Board of Review.

Affirmed.

16